[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This couple is before the court on a contested dissolution action initiated by the plaintiff husband. The case was tried over four (4) days (February 5 and 6 and April 9 and 18, 2001) and both parties were effectively represented by counsel. Each party testified and the court observed their demeanor and evaluated their credibility. Three (3) additional witnesses testified and numerous exhibits were offered. Each submitted a sworn financial affidavit and claims for relief. The principal issue is the distribution of real property — CT Page 5741-a specifically, a condominium at Deerfield Woods (no. 221), 3699 Broadbridge Avenue, Stratford, Connecticut.
Both parties were born in Poland; each continues to have difficulty with the English language and the assistance of an interpreter was required. The husband will be sixty-one (61) in June of this year. He had an eighth grade education in Poland and came to the United States twenty-one (21) years ago. Though a chronic alcoholic, he is apparently otherwise in good health. When last regularly employed, he worked as an industrial spray painter for Moore Special Tools. His first wife died in November of 1993. The house they owned together was subsequently sold for $150,000, of which he received $72,000, the remainder being distributed to his first wife's grown children of a prior marriage. From that sum, the husband bought the subject condominium for $45,000 and he proceeded to make improvements. At some time prior to the instant marriage, he also received $15,000 in retirement funds. Though he failed to include it on his financial affidavit, the husband also owns farm land in Poland, land he stated was worth only $3,000.
The defendant wife is presently forty-two (42). She is a high school graduate who grew up on a farm her father owned in Sekolka, Poland. The father has since died and the farm has been sold. She had no interest in the land and received nothing from the sale. The wife worked on the farm until she was eighteen (18), at which time she married and went with her new husband to work his family farm for approximately nine (9) years. At that time, the husband left her to come to the United States and, when he met a woman here, the couple divorced in Poland. They had one (1) son, then six (6) years old, whom she raised in Poland until she emigrated; that son, now twenty-two (22), lives in the United States with his mother and works in the construction field. Following the wife's divorce, she returned to her parents' home for one (1) year and again worked on her father's farm. Following that, she worked as a secretary for approximately one (1) year and she spent the next eleven (11) years cooking in a hospital. In April of 1994, she purchased from the government a small apartment for herself and her son[1] with $1,200 borrowed from her mother, an amount she testified remains unpaid. The apartment continues to be the wife's and her mother now resides there.
In June of 1995, the husband, determined to take a new wife, went to Poland to find one. His primary goal was to find a younger woman. This wife, herself interested in finding a new husband, was introduced to him through a friend and she testified he told her he was doing very well in America and that he had a car, a good job and "plenty of money." She believed he would be a responsible husband and so she accepted his CT Page 5741-b proposal within a few days of their first meeting. He immediately returned to the United States while the necessary documents were being prepared in Poland but returned a month later and, on July 12, 1995[2], they were married. He paid for the wedding. The wife remained in Poland for one (1) year — ostensibly to care for her teenage son; the husband returned to his condominium here shortly after the marriage. From time to time over the next year, he sent her money and clothes (She testified they were "used."); they spoke by phone once a week. On or about August of 1996, she came to the United States, leaving her son in Poland in the care of her mother and sister. The husband paid her air fare.
The husband testified that, once he left his regular employment at Moore Special Tools[3], he worked on and off as a painter, earning $500 to $600 per week and he further stated that, when the wife came to the United States, he was working six (6) days a week, eight to ten (8-10) hours per day, making $8.00 an hour. However, he also stated that job lasted only a "couple of months" and that he then had only $1,000 to his name. He said he next worked at a cleaning job in Monroe twelve (12) hours per day for $450 per week (No verification of this was offered.) and that, for two (2) years, he worked a part-time evening job for Halina's Cleaning Service in Milford cleaning offices. His employer, Halina Chmiel, testified that in fact he first reported to work in early December of 1998 and last worked there on or about November 8, 1999.
Shortly after her arrival, the husband told her she had to go to work to buy food and he asked his sister to find the wife a job — which she did.[4] For one (1) year, the wife cleaned the home of a wheelchair-bound woman and she tended to the woman's personal needs as well. Working from 6:00 a.m. until 3:00-4:00 p.m., five-six (5-6) days per week, she earned $220.00 per week. Some time within that first year, she also began to clean another home on Saturday, receiving $80.00 for eight (8) hours. She testified her husband complained she needed to make more money and so, beginning in August of 1997, she found other houses to clean (By then, she no longer cared for the wheelchair-bound client.). She worked five (5) days per week for which she earned $350 and, on Saturday and Sunday, she cooked, cleaned, and personally attended a client in Westport, working twenty-four (24) hours per day for $200 per weekend. From August of 1998 to August of 1999, she continued to clean homes six (6) days a week earning $400 per week; she also stated she too worked for Halina's Cleaning Service, cleaning offices nights with her husband. She asserted she worked there from May of 1998 (prior to her husband's starting date) until the end of 1999, working 6:00-11:00 p.m., Monday through Saturday, for $150 a week. CT Page 5741-c
The wife's testimony was that her earnings were spent paying the household bills, buying food and clothes, and sending money to Poland for her son's needs. At first she sent $100 a month and she increased it to $150 a month as her income grew. The husband insisted it was he who paid all the household bills and bought the food while they shared a home and that her money was spent buying things for herself, sending money to Poland, and paying for her long distance calls to Poland; that use of her income would have defeated the husband's purpose in finding her work. It is so that the husband's sister taught the wife how to use money orders and the wife learned to do that on her own to pay the bills in her husband's name. It is of no surprise the money orders were in the husband's name since he then owned the condominium and all of the accounts (i.e., for water, utilities, phone, cable t.v., etc.) were originally established in his name. She testified the husband was only sporadically employed throughout the marriage. Given that the evidence of her income was uncontroverted, the court finds it was she who produced the income necessary to pay the bills while he had no regular employment earnings and, for that reason as well as for other reasons next here referenced, the court finds her testimony to be more credible.
The wife testified she learned within the first months of her arrival that her husband had lied to her in Poland; he had neither a car nor a good job and he did not have "plenty of money." She also stated her husband's sister immediately told her the husband had an alcohol problem[5] and that, in the first month after her arrival, he came home drunk approximately once per week. He told her she was ugly and that he was ashamed to be seen with her (He denied the latter assertion saying he was actually "proud" of her.). As time went on, she stated he became increasingly more violent. She described an incident in which he threw out the Christmas tree and ornaments and her clothes; on another occasion, she stated he broke the radio and telephone and damaged the sofa; on four (4) occasions, she reported to police he had assaulted and threatened her and he was arrested on three (3) such occasions. See defendant's exhibits 5 (regarding incident of April 15, 1997), 2 (regarding incident of June 15, 1997), 13 (regarding incident of November 11, 1999), and 17 (regarding incident of January 27, 2000). Five (5) protective orders were entered against him. See defendant's exhibits 4 (Order of June 16, 1997), 14 (Order of January 29, 1999), 16 (Order of December 14, 1999), 18 (Order of February 4, 2000) and 19 (Order of February 4, 2000). He was ultimately ordered out of the marital premises and he has not lived in the condominium since December of 1999.
Despite the testimony of the husband and his sister he did not have a CT Page 5741-d serious drinking problem prior to his first wife's death and that he did not often drink after her death except for the one (1) year following her death,[6] the evidence established otherwise. Seven (7) months prior to his first wife's death, he went to Bridgeport Hospital for a reason unrelated to drinking. The records of that visit, however, referenced a "history of alcohol"; he admitted to drinking the previous night and denied drinking at all that date though, at 12:13 p.m., there was the smell of alcohol on his breath and he tested at .293 (defendant's exhibit 45A). On April 7, 1995, 17 months post his first wife's death), at 2:19 p.m., his alcohol reading was .414 (defendant's exhibit 45E); it was .367 at 5:00 p.m. on November 19, 1997 (defendant's exhibit 45G). At 4:32 p.m. on July 27, 1998, he tested .250 (defendant's exhibit 45H) and, at 10:26 p.m. on May 20, 1999, it was .265 (defendant's exhibit 45L).
He was arrested numerous times for operating under the influence and was given a three year suspension of his driving privileges effective July 5, 2000, for having had three (3) DUI convictions (defendant's exhibit 20). He was involved in a number of motor vehicle accidents — most while driving under the influence, at least one (1) of which may have involved injury to a mother and son whom he rear-ended on November 10, 1999, (defendant's exhibit 10) and his wife testified he seriously damaged two (2) cars paid for with her earnings (He denied she paid for the cars.). It was because he feared another motor vehicle accident might result in the loss of the condominium that he quitclaimed the condominium to her on June 14, 1999 (defendant's exhibit 9); in fact he was involved in another such accident fifteen (15) days later (defendant's exhibit 45C). He has been picked up numerous times for public drunkenness (See, for example, defendant's exhibits 1 and 7.). He violated protective orders and, on at least one (1) occasion, he failed to appear in court, thus requiring his re-arrest (defendant's exhibit 15) Bridgeport Hospital has a judgment lien against him in the amount of $420.37 plus $30.00 costs and interest (defendant's exhibit 23). He now lives at Prospect House in Bridgeport, a homeless shelter, and has been receiving public assistance; thus, the Department of Social Services has asserted a generic lien.
If the sister and husband lack credibility — as the court ineluctably concludes, so too does Halina Chmiel. She testified the husband asked her if his wife could work with him on his part-time evening cleaning job and Ms. Chmiel agreed. She testified the husband was a good worker whereas the wife's work was unsatisfactory and, for non-specific reasons, she impugned the wife's honesty. This even though the husband left her employ without the giving of any notice.[7] She was, however, clear the husband did not begin to work for her until CT Page 5741-e December of 1998 and he could not have earned more than $450 for that year; yet, she had no explanation why the 1998 W2 she issued him showed wages to him of $5,012.50 (plaintiff's exhibit E) except to say that was "impossible." The better explanation is that, though she denied the wife began working for her in mid 1998 as the wife had testified, it was in fact the wife who earned all but $450 of the amount attributed to the husband on the 1998 W2 despite every check being made out to the husband. One can only speculate whether Ms. Chmiel's apparent dishonesty was because of her acquaintance with the husband for over twenty (20) years, because she knew the wife lacked a work permit, or whether it was simply for reasons of personal dislike for the wife. Though the wife continued to work for Ms. Chmiel in 1999, she personally was never issued a check for her services. The husband's 1999 W2 showed $7,435 paid him in wages (plaintiff's exhibit C).
The only credible witness called by the plaintiff was Mr. Brooks Parmalee. Pretrial Coordinator at the Co-Op Center in Bridgeport, Mr. Parmalee first met the husband when, in February of 2000, the court referred the husband there following his release from custody. He testified the husband was receiving inpatient alcohol treatment and that it was reasonable to conclude his alcoholism was "acute" at that time (The husband testified he has not had a drink in over a year.). Mr. Parmalee has investigated numerous employment sources in an effort to find the husband work. Though he testified the husband's prospects for finding employment within the next six-eight (6-8) months were "fairly good", that prognostication may more accurately measure this gentleman's hope than it is a reflection of reality in view of the husband's lack of transportation and inability to drive, his language deficit, his age, his criminal record, and his employment skills.
The wife is not totally without fault. She engaged in a relationship with an unrelated male who, for a period of four (4) months, shared the condominium with the wife and her son. The husband testified she was seeing this man socially while the husband still lived in the marital home, an allegation the wife was never asked to address. She also showed weekly deductions on her February 5, 2001, financial affidavit for federal, state, and self-employment taxes which she testified to never having made. Though she has kept current the condominium common charges once her husband was ordered out, she has not paid all of the property taxes due and that is her responsibility given her then ownership of the condominium and the continued presence there of herself and her son — both of whom continue to be employed.
This was not a union born of love; strangers when they married, neither CT Page 5741-f had a reason to trust or respect the other. Each came to the marriage for different reasons. Neither viewed the other as a romantic lead. The wife wanted a good provider whom she hoped would care for her and she looked forward to life in this country. In fact, the husband did not provide for her and there is no evidence he ever learned to care for her. He wanted a younger woman — not because he wanted a trophy wife but because, since he had exhausted all but $1,000 of his funds when he married and he lacked full time steady employment with little reason to believe his prospects were bright, he required a worker (and no doubt hoped for a companion). Thus, the alacrity with which the husband commissioned his sister to find his new wife a job so soon after the wife's arrival in the United States. He got the worker he sought though he had not the companion for which he may have wished.[8] Given the wife's present age and capacity for work, she is not without the means to support herself despite the absence of any evidence of current savings. The husband is homeless, considerably older than she, and without the present means to support himself.
In formulating proper orders in this case, the court must consider the factors set forth in § 46b-81 together with the provisions of §46b-62 regarding attorney's fees. The court has considered all of these factors in making its determinations and has considered all of the evidence, the parties' demeanor and credibility, their financial affidavits, claims for relief, and all of the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v. Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman,188 Conn. 232, 234 (1982). The court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding. Lee v. Lee, 197 Conn. 1, 5 (1985). It need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307,313-14 (1991). With specific regard to property assignment and what alimony award, if any, is appropriate[9], the court is mindful our alimony statute does not recognize an absolute right to alimony. General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487 (1970).
In Blake v. Blake, 207 Conn. 217 at 230 (1988), our Supreme Court cited with approval the language of O'Neill v. O'Neill, 13 Conn. App. 300, at 311 (1988), in which our Appellate Court stated as follows:
 A property division ought to accord value to those CT Page 5741-g nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities. O'Neill v. O'Neill, 13 Conn. App. 300, 311 (1988).
The court has considered the issue of counsel fees as requested by the wife. Such fees are allowable under the provisions of § 46b-62 of the General Statutes. The wife has requested payment of her counsel's fees of $7,500 through trial though no affidavit regarding services has been submitted. She has significantly greater earning capacity than does her husband and has borrowing power her husband does not have.
The court, in addition to the foregoing, finds as follows:
1. There is the requisite jurisdiction.
 2. The allegations of the husband's complaint have been proved and are true.
 3. There has been an irretrievable breakdown of the marriage.
 4. The primary cause of the breakdown is the husband's drinking and a course of conduct inconsistent with marital peace.
The court enters the following orders:
 1. A dissolution of the marriage enters on the husband's complaint on the grounds of irretrievable breakdown of the marriage.
 2. The marital property shall be placed on the market for sale within thirty (30) days of this date by a listing agent/realty company agreeable to the parties (If the parties cannot agree upon the CT Page 5741-h same, they may submit a listing of three (3) to be directed to this court which shall retain jurisdiction for this purpose alone.). The defendant shall have sole use and possession of the property until the date of sale and she shall be responsible for paying all expenses associated with maintaining the condominium from December 1, 1999, until the closing, including but not limited to real estate taxes, common charges, and sewer use fees such that all payments are current at the closing. She shall also be responsible for all usual household charges to include water, utilities, telephone, and cable television. Any improvements to the property prior to the closing shall be completed only with the agreement of both parties and the costs shall be borne equally by the parties. Any expenses for the condominium which are paid in advance by the wife and which are apportioned or adjusted at the closing shall be credited to the wife.
 3. The net proceeds from the sale after deducting the normal and customary expenses of closing including but not limited to the real estate commission, conveyance taxes, and attorney fees shall be divided equally between the parties. Any liens or encumbrances on said property shall be paid and released by the party causing and/or responsible for same and said liens/encumbrances shall be paid and satisfied out of said party's respective share of the net proceeds.
 4. The wife shall have ownership and possession of all of the kitchen/bedroom/dining room furniture presently in said condominium to include all utensils, pots and pans, and decorating accessories. The husband shall have exclusive ownership and possession of all of the living room and/or family room furniture to include all decorating accessories. Should there be any disagreement with regard to the same, the parties may seek the assistance of the Family Relations Office of this court or, failing that, shall mediate the same to resolve such disputes. CT Page 5741-i
 5. All of the husband's clothing and tools shall be returned to him within thirty (30) days of this date by arrangement through counsel.
 6. Each party shall be responsible for his/her own counsel fees.
 7. Neither party shall pay to the other any amount in alimony.
 8. The husband shall be solely responsible for payment/release of the state assistance lien and the judgment obtained by Bridgeport Hospital for his care and treatment and he shall indemnify and save harmless the wife regarding the same.
 9. The husband shall be solely responsible for any settlement/judgment which has been or may be obtained against him with regard to any personal injury or property damages proximately caused by his negligence in his operation of any motor vehicle during the marriage, which vehicle was owned by him or the wife or owned jointly by them at the time of said accident and he shall indemnify and save harmless the wife with respect to such settlement/judgment.
 10. With regard to any joint state or federal income tax returns filed during the course of the marriage, the parties shall share equally any refunds not yet paid. The party whose omission, negligence, or misrepresentation caused the assessment of any penalties on such joint returns — to include interest — shall be responsible for payment of such sums and shall indemnify and save harmless the other with regard to those assessments.
 11. The wife shall have sole use and possession of the 1991 Mercury Topaz and shall be fully responsible for all loans, taxes, insurance, and other costs incident to her ownership of said vehicle. She shall indemnify and save harmless the husband CT Page 5741-j regarding the same.
 12. Except as above referenced, each shall be responsible for all debts/liabilities listed on his/her financial affidavit of February 5, 2001, as well as for any debts incurred by him/her without participation by the other party.
 13. Each party shall be responsible for payment of his/her own medical insurance.
SO ORDERED this 27th day of April, 2001.
B. J. SHEEDY, JUDGE